UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ANTOINETTE LIGGINS, individually and on behalf of B.C., a minor., <br><br> Plaintiff, <br><br> vs. <br><br> OFFICER MICHAEL COHEN, individually and in his official capacity, and the CITY OF SAINT LOUIS, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No.  4:16-cv-00413-AGF <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM AND ORDER

The case arises out of the July 11, 2015, shooting of Plaintiff Antoinette Liggins's 16-year-old son, B.C., by City of St. Louis police officer Michael Cohen.   B.C. survived but suffered permanent partial paralysis, rendering him a paraplegic.   Plaintiff filed suit on March 25, 2016, asserting claims under 42 U.S.C. § 1983 and Missouri law against Cohen, in his individual and official capacities, and against the City of St. Louis for money damages.[1]   The only remaining claims are a § 1983 claim against Cohen, in his individual capacity, alleging excessive force in violation of the Fourth and Fourteenth Amendments; a § 1983 claim against the City alleging municipal liability; and state-law assault, battery, and loss of services claims against Cohen.[2]

---

[1]     The case was stayed for nearly two years, with the consent of the parties, pending a decision by the City Circuit Attorney's office regarding whether to issue criminal charges against Cohen.   The Court granted Plaintiff's motion to lift the stay on March 8, 2018. ECF No. 75.   To the Court's knowledge, no charges have been filed against Cohen to date.

[2]     Plaintiff has not separated the claims in her amended complaint by count.   *See* ECF No. 3.   The Court previously dismissed without prejudice Plaintiff's due process claims

The matter is now before the Court on Defendants' motion (ECF No. 107) for summary judgment.   For the reasons set forth below, the Court will deny Defendants' motion as to Plaintiff's § 1983 claim against Cohen in his individual capacity; the Court will grant Defendants' motion as to all other claims.

## BACKGROUND

Viewing the evidence and all reasonable inferences in the light most favorable to Plaintiff, for purpose of the motion before the Court, the record establishes the following. On July 9, 2015, Anna Marie Jones purchased a .40 caliber Hi-Point pistol and ammunition, gave possession of the gun and ammunition to her boyfriend Chris McClung, and then dropped off McClung and the gun at an apartment complex located on Hodiamont Avenue in the City (the "Complex").   On the evening of July 10, 2015, B.C.'s brother, 15-year-old A.C., stole the gun from McClung.

On the evening of July 11, 2015, at approximately 7:10 p.m., Jones placed a 911 call to the City Police Department and reported that A.C. had been observed at the Complex with her stolen .40 caliber Hi-Point pistol.   In her 911 call, Jones reported that A.C. was wearing a red hoodie and blue shorts, and that he was at that time standing in the breezeway of the second apartment of the Complex.

Shortly thereafter, City Police Officer Cohen was notified of Jones's 911 call.   On that date, Cohen was serving as a field training officer and was accompanied by two

under § 1983 that were asserted on her own behalf, rather than on behalf of B.C., as well as Plaintiff's state-law claims against the City.   ECF No. 28.   Any claim against Cohen in his official capacity is treated as a claim against the City.   *See Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 800 (8th Cir. 1998).

2

"probationary" officers, Kathleen Gutjahr and Paul Chester.   City Police Officers

Brandon LaGrand and Matthew Shaw also assisted Cohen responding to Jones's 911 call.

Unbeknownst to the officers, at some point on July 11, 2015, B.C. had taken the gun

away from A.C. in order to return it to McClung.   For the purpose of this motion, the

Court accepts that B.C. had never handled a gun before.

Cohen knew A.C. because he had met him a couple of weeks before July 11, 2015,

in connection with an investigation of an unrelated carjacking.   As part of the carjacking

investigation, Cohen also viewed a surveillance video showing A.C. and B.C. occupying

the stolen vehicle and thus believed that they had been involved in criminal activity.

Cohen had decided at that time that if he saw A.C. and B.C. again, he was going to take

them into custody; Cohen knew at that time that A.C. and B.C. were brothers and that both

brothers were minors.

Cohen, Shaw, and LaGrand were also familiar with the Complex and knew the

Complex had a history of violent activity.   Cohen was aware that it was a common

occurrence for people in or around the Complex to run away from police.   Specifically,

Cohen was aware of a hole in the fence at the rear of the Complex, on the right side, behind

a playground, by which individuals in the Complex often escaped police.

After being notified of Jones's 911 call at 7:10 p.m. on July 11, 2015, but before

responding to the call, the five officers met and devised a plan for approaching the

Complex and apprehending A.C.   Cohen led the planning meeting, and during this

meeting, Cohen discussed the hole in the fence at the rear of the Complex.   Under Cohen's

plan, LeGrand and Shaw were to approach the front of the Complex.   Cohen would go

around the rear, accompanied by Chester and Guthjar, to prevent A.C. from fleeing through the hole in the rear fence.

The officers approached the Complex at approximately 7:26 p.m. on July 11, 2015. Shaw and LaGrand drove in separate vehicles to the front of the Complex, and Cohen drove a third vehicle to the rear parking lot of the Complex. Chester and Guthjar accompanied Cohen—Chester in the front passenger seat and Guthjar behind Chester. The officers drove police vehicles but did not turn on their lights or sirens.

B.C. was standing in the first floor breezeway of an apartment in the Complex when the police vehicles began arriving. The breezeway connected the Hodiamont Avenue side of the Complex to the rear parking lot and playground. When the police arrived, other people were gathered in the breezeway, and B.C. heard "a bunch of" people start yelling "Police! Police!" ECF No. 108 at 3. B.C. was wearing a white baseball shirt and knee-length blue denim shorts at that time. He was carrying the Hi-Point pistol in a blue over-the-shoulder bag.

B.C. knew he had the gun in his bag and did not want to get in trouble, so he began to flee through the breezeway to the front of the Complex, toward Hodiamont Avenue. As soon as B.C. emerged from the breezeway's front opening, he observed police approaching the Complex. After seeing the police, B.C. quickly pivoted and ran back into the breezeway toward the rear of the Complex. As he turned to run back into the breezeway, B.C. began to reach for the gun inside his over-the-shoulder bag.

While running through the breezeway and toward the rear of the Complex, B.C. removed the gun from his bag in order to dispose of it. B.C. was holding the gun by the

4

barrel and pointed down in his right hand when he emerged from the breezeway at the rear of the Complex, in front of the rear parking lot and playground.

Meanwhile, Cohen was pulling his police vehicle into the rear parking lot. The parking lot was situated between the breezeway and the rear fence, directly to the left of the playground. There was a green pick-up truck parked in the parking spot closest to the playground. Cohen pulled into the parking spot to left of the pick-up truck, such that the pick-up truck stood between Cohen's vehicle and the playground.

In his deposition in this case, Cohen testified that, even before he got out of his police vehicle, he saw the person now identified as B.C. running through the breezeway, carrying a gun in his right hand, held down at his side.[3] Defs.' Statement of Facts, Ex. H, Cohen Dep., ECF 108-8 at 112-113, 117-119. There is no evidence that Cohen recognized that the person was B.C. at the time, and Cohen testified that he did not recognize it was B.C. As noted above, B.C. was wearing a white t-shirt and not a red hoodie like the one Jones reported A.C. to be wearing. Cohen was not aware at this time of any bystanders located close by; surveillance video (discussed further below) shows that there were a few bystanders present in the area but none nearby or directly in B.C.'s path.

Cohen then exited his police vehicle and ran around the back of the pick-up truck toward the playground, intending to cut off B.C.'s path toward the hole in the rear fence. *Id.* at 126. As Cohen approached the playground, he had his gun drawn and pointed at B.C.

---

[3] Cohen testified that he yelled "Gun, Gun, Gun" when he saw B.C. with the gun, but B.C. and other witnesses present at the scene testified that they did not hear Cohen or the other officers yelling anything.

At this time, B.C. was still running fast from the breezeway onto the playground while holding the gun by the barrel and pointed down in his right hand. As he was running, B.C.'s hands were down low, by his sides, but they were moving at least slightly because he was running. Defs.' Statement of Facts, Ex. C, Claxton Dep., ECF No. 108-6 at 72. B.C. was not aware that there were any police officers at the rear of the Complex. B.C. was attempting to run away from the police that he had seen in the front of the Complex and was heading toward the hole in the fence. Again, accepting Plaintiff's rendition of the facts, the path that B.C. was taking is depicted in Defendant's Exhibit P (ECF No. 108-16), which is a photograph of the rear of the Complex that was marked up by B.C. during his deposition in this case.[4] This path would have led B.C. away from Cohen.

Meanwhile, Chester and Guthjar had exited the passenger side of Cohen's police vehicle and were running around the front of the pickup truck toward the playground. All of the officers were in uniform but did not announce themselves as police when they encountered B.C. Although Cohen and some of the witnesses testified that Cohen yelled "Drop the gun" before he fired his first shot,[5] B.C. did not hear Cohen or any other officer

---

[4] Cohen disputes these facts and asserts that B.C. was holding the gun by the grip and that, while B.C. was running toward the playground and immediately before Cohen fired his first shot, B.C. turned toward Cohen and began to raise his gun in Cohen's direction. Cohen admits that B.C. had not brought the gun "fully up to bear" before Cohen fired his first shot. ECF No. 144 at 12.

[5] Chester corroborated Cohen's testimony that Cohen yelled "Drop your gun." Another witness testified that he was home in his ground-floor apartment at the time and heard commands to "drop the weapon" immediately before hearing gunshots. Plaintiff argues that this testimony is unreliable because the witness testified to several different versions of what he heard and also described events that did not exactly match the events that occurred on the night in question (such as a police chase through an alleyway),

yell anything before firing.   Nor did two other witnesses who were on the second-floor balcony of the Complex at the time.

B.C. was still running fast with the gun in his right hand, held by the barrel and pointed down, when Cohen fired his first shot.   B.C. and two witnesses to the incident testified that B.C. never turned his body toward the police before Cohen fired.   Cohen fired four shots in total within a matter of seconds.   After the first shot, which missed B.C., B.C. dropped the gun and turned his head to look in the direction of Cohen.   The second shot grazed the right side of B.C.'s head, the third shot hit B.C.'s right forearm, and the fourth shot hit B.C.'s abdomen, while B.C. was on the ground.[6]   At the time B.C. was on the ground, he did not have the gun in his hand.   B.C. was already on the ground by the time Chester and Guthjar caught up to him.   The gun was found near B.C.'s body, but the parties dispute how close it was to B.C.

## ARGUMENTS OF THE PARTIES

Defendants argue that Plaintiff's § 1983 claim for excessive force against Cohen in his individual capacity fails because, even viewing the facts in the light most favorable to B.C., Cohen reasonably believed that B.C. posed a threat of serious physical harm to him. At a minimum, Defendants argue that Cohen is entitled to qualified immunity on this claim because it was not clearly established at the time of these events that "it was a Fourth Amendment violation for an officer to use deadly force against a suspect who ran in his

_____

suggesting that he may have been remembering a different incident.   ECF Nos. 108 at 4 & 121 at 5.

[6]      Again, Cohen disputes these facts and asserts that the gun did not fall from B.C.'s hand until after the fourth shot and as B.C. was falling to the ground.

direction with a gun moving in his right hand."   ECF No. 113-1 at 10.

Defendants further argue that Plaintiff's § 1983 claim against the City for municipal liability fails because there is no underlying constitutional violation and, even if there were, Plaintiff has failed to offer evidence of a City policy, custom, or practice that caused such a violation.   Finally, Defendants argue that Cohen is entitled to official immunity on Plaintiff's state-law claims.

In response, Plaintiff contends that there are genuine issues of material fact with respect to the excessive force claim, which, when viewed in the light most favorable to Plaintiff, demonstrate a violation of B.C.'s clearly established constitutional rights. Specifically, Plaintiff points to the following factual disputes:   (1) whether Cohen knew that B.C. was not a suspect in the 911 call to which Cohen was responding; (2) whether B.C. was running toward Cohen or fleeing in the moments before he was shot; (3) whether B.C. ever raised his gun in Cohen's direction; (4) whether Cohen warned B.C. to drop the gun; (5) whether B.C. dropped the gun "as soon as he heard the first gunshot . . . which did not make contact with him," and "before Defendant Cohen had fired his last three gunshots," (ECF No. 124 at 44); and (6) whether B.C. was therefore "shot while he was falling, and on the ground, unarmed" (*id.* at 45).

Plaintiff also contends that Cohen's actions should not be given the same allowance that courts often afford police officers acting under tense, uncertain, and rapidly evolving circumstances.   Plaintiff notes that Cohen made a tactical decision to approach the Complex from the rear and was expecting an armed individual to emerge from the breezeway and attempt to escape through the hole in the rear fence.   Thus, Plaintiff argues

8

that Cohen's actions were not the result of split-second decision-making but were part of a strategic plan.

With respect to the municipal liability claim, Plaintiff argues that Cohen violated B.C.'s constitutional rights and that a pattern of officer-involved shootings in the City "show[s] a custom of using excessive force with little to no consequence." ECF No. 124 at 53. In support of this contention, Plaintiff offers evidence of at least five other officer-involved shootings in the City from 2011 to 2015, most involving young African-American male victims like B.C., in which there were allegations of unjustified force. Plaintiff argues that Roger Engelhard, the Commander of the Force Investigation Unit for the City's police department at the relevant time, investigated many of these shootings and that his failure to issue any reprimand, discipline, or finding of a violation created a de facto policy of "shoot first and ask questions later." *Id.*

Finally, Plaintiff argues that Cohen is not entitled to official immunity on Plaintiff's state-law claims because, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that Cohen acted with bad faith or malice sufficient to overcome a claim of official immunity.

## DISCUSSION

### Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he burden of demonstrating that there are no genuine issues of material fact rests on the moving party," and the court must

view "the evidence and the inferences that may be reasonably drawn [therefrom] in the light most favorable to the non moving party." *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015).

## Surveillance Video

Both sides have submitted a copy of the same surveillance video of the incident (Defs.' Statement of Facts, Ex. G & Pl.'s Resp. to Defs.' Statement of Facts, Ex. C). Plaintiff has also submitted a version of the video "with zoom" (Pl.'s Resp. to Defs.' Statement of Facts, Ex. D), as well as "still frame shots" from the video (Pl.'s Resp. to Defs.' Statement of Facts, Ex. N). All versions of the video, as well as the still frame photographs, are low-resolution and grainy. The video has no sound.

As Defendants correctly note, the Court need not accept Plaintiff's version of the facts on this summary judgment motion if the video evidence "conspicuously refutes and completely discredits" that version. *See Wallingford v. Olson*, 592 F.3d 888, 892–93 (8th Cir. 2010). The video evidence here, however, does no such thing.

For example, Defendants argue that the surveillance video "blatantly contradict[s]" B.C.'s assertion that he was running toward the hole in the rear fence when he was first shot by Cohen. ECF 145 at 4. Defendants contend that "[i]f [B.C.] had been running toward the hole in the fence as he claims, he would have turned to his right as he passed the [playground] slide," and the "surveillance video *does not* show [B.C.'s] body turning to the right towards the hole in the fence. It shows [B.C.] moving in Cohen's direction." *Id.* at 5 (emphasis in original).

But from the Court's review, B.C. is barely visible in the surveillance video. By

the time B.C. enters the frame, the only part of his body that is visible is his foot, and it appears that he is already in the process of falling to the ground. By the time any more of B.C.'s body enters the frame, he is sliding to the ground. Although B.C.'s foot appears to be facing Cohen when it enters the frame, because the video has no sound (and Cohen's gun is raised the entire time), the Court cannot tell from the video whether the first shot had already been fired by this time, after which B.C. testified that he turned his head to look at Cohen. It is not at all clear from the video when the first shot was fired by Cohen or how B.C. or Cohen were positioned at that time.

Defendants also contend that "a frame by frame analysis of the video shows [B.C.] continuing to raise his arm toward and turn his torso toward Officer Cohen," specifically pointing to "second 13," where Defendants asserts that "the video shows [B.C.'s] right arm continuing to raise (with what appears to be a dark object in his right hand)." ECF 145 at 5. Again, the Court's view of the video is not so clear. At second 13 of the video, B.C. appears to be on the ground already, in the midst of falling. It is unclear what, if anything, is in his right hand because the video is so blurry. And, again, because the video lacks sound, the Court has no way whether Cohen had already fired a shot at B.C. by this point.

Plaintiff's reliance on the video evidence is also unavailing. For example, Plaintiff argues that "[t]he video does not show that Officer Cohen verbalized any commands to [B.C.] before he opened fire upon him." ECF No. 121 at 14. But the video is too grainy to clearly see Cohen's mouth, even in the zoomed-in version of the video that Plaintiff provided. Nevertheless, as discussed below, the Court will assume for the purpose of Defendants' motion that Cohen did not verbalize any commands before firing.

However, one thing that is clear from the surveillance video is that the entire encounter between Cohen and B.C. took place within a matter of seconds. From the Court's review of the video, approximately ten seconds passed from the time Cohen pulled into the parking spot at the rear of the Complex until B.C. was laying on the ground and Chester and Guthjar approached.

## Qualified Immunity

"To defeat a motion for summary judgment based on qualified immunity, the plaintiff must put forth facts showing that the officer's conduct violated a constitutional right, and that the right was clearly established at the time of the alleged misconduct." *Johnson v. Moody*, 903 F.3d 766, 773 (8th Cir. 2018).

With respect to the second prong, "'clearly established law' should not be defined 'at a high level of generality.'" *Morgan v. Robinson*, No. 17-1002, 2019 WL 1497073, at *2 (8th Cir. Mar. 29, 2019) (quoting *White v. Pauly*, 137 S.Ct. 548, 552 (2017)). "Instead, the clearly established law must be 'particularized' to the facts of the case." *Id.* There need not be "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citation omitted). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 551.

The Supreme Court has stressed that "[s]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152

(2018) (citation omitted). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, the test is whether the amount of force used was objectively reasonable under the particular circumstances." *Church v. Anderson*, 898 F.3d 830, 832 (8th Cir. 2018) (citation omitted).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The question "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–397.

"Before employing deadly force, an officer should give 'some warning' when it is 'feasible' to do so." *Loch v. City of Litchfield*, 689 F.3d 961, 967 (8th Cir. 2012) (citation omitted). The failure to give a warning where feasible may "add[] to the unreasonableness" of an officer's actions. *Ngo v. Storlie*, 495 F.3d 597, 603 (8th Cir. 2007).

As described above, the "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."

*Kisela*, 138 S. Ct. at 1153. "Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force." *Id* (citation omitted).

**Excessive Force Claim Against Cohen**

As an initial matter, the Court will not analyze Cohen's four shots separately, as Plaintiff attempts to do. It is undisputed that the four shots occurred in rapid succession. "This would be a different case if [Cohen] had initiated a second round of shots after an initial round had clearly incapacitated [B.C.] and had ended any threat . . . . But that is not what happened." *See Church*, 898 F.3d at 834. Thus, the Court will treat Cohen's four shots as a single use of deadly force.

Nevertheless, the Court agrees with Plaintiff that it cannot be determined, on this summary judgment record, that Cohen's use of deadly force was reasonable as a matter of law. Although not all of the factual disputes Plaintiff cites are material, the Court concludes the following genuine issues of material fact preclude summary judgment: (1) whether a reasonable officer in Cohen's position would have perceived that B.C. was running toward the officer immediately before the first shot;[7] (2) whether Cohen gave any warning before firing a shot; and (3) if no warning was given, whether it was feasible for Cohen to give a warning.

As noted above, contrary to Defendants' assertion, the surveillance video does not conclusively show that B.C. was facing Cohen or moving in Cohen's direction before

---

[7] This dispute of fact is relevant to whether B.C. reasonably could have been perceived as an immediate threat to the officer. Defendants have never suggested that B.C. was an immediate threat to anyone other than Cohen.

Cohen fired the first shot.   Notably, both Plaintiff and Cohen agree that, at least initially, B.C. was running away from Cohen's position at the left rear side of the playground and toward the hole in the fence on the right rear side of the playground.   Cohen also knew where the hole was and was expecting B.C. to run toward it.     The parties agree that, at some point while running, B.C. turned (either his body or his head) toward Cohen.   But the parties dispute how and when this occurred—Cohen asserts that B.C. turned his body toward Cohen and began to raise the gun in Cohen's direction before Cohen fired the first shot, and B.C. asserts that he only turned his head toward Cohen after Cohen fired and that he never raised the gun toward Cohen.

Likewise, the parties dispute whether Cohen gave any warning before firing.   As Defendants note, in *Malone v. Hinman*, 847 F.3d 949 (8th Cir. 2017), the Eighth Circuit held that a police-shooting victim's testimony that he did not "hear" a warning did not contradict the officer's positive testimony that he gave a warning, and therefore, did not create a question of fact.   847 F.3d at 954 n.3.   But in *Malone*, no other witnesses discussed whether warnings were given, and the victim testified that he was experiencing an "adrenaline rush" at the time and therefore "did not hear anything."   *Id.*

Here, B.C. and two other witnesses who were nearby testified that they heard no warning before shots were fired, and Defendants have not offered evidence to suggest that B.C.'s or the witnesses' hearing was impaired.   Cohen testified that he gave a warning to drop the weapon, and Chester and another witness testified that they heard such a warning. This conflicting evidence raises a dispute of fact.   And because the record does not reflect details such as how far B.C. was from Cohen, how fast he was running, or the parties'

respective positions before Cohen fired, the Court cannot determine as a matter of law whether a warning was feasible under the circumstances.

In short, a rational jury could believe B.C.'s testimony that he was running away from Cohen and never made any threatening movement toward Cohen before Cohen fired without any warning under circumstances in which it was feasible to give a warning. In that case, Cohen's use of deadly force would have been objectively unreasonable. *See Wilson v. Lamp*, 901 F.3d 981, 989 (8th Cir. 2018) ("Force may be objectively unreasonable when a plaintiff does not resist, lacks an opportunity to comply with requests before force is exercised, or does not pose an immediate safety threat."). This is especially true as Cohen was there in anticipation that the suspect would flee through the hole in the fence.

As to the question of qualified immunity, at the time of the shooting here, a reasonable officer in Cohen's position would have known that shooting, without any warning, a suspect who was fleeing from police and who "pose[d] no immediate threat to the officer and no threat to others" violated a clearly established constitutional right. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see also Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009); *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005). This is true even if the suspect was armed. *See Nance*, 586 F.3d at 611; *Craighead*, 399 F.3d at 962.

For example, in *Craighead*, the evidence construed for the purpose of summary judgment demonstrated that an officer shot the decedent, whom the officer mistook to be a suspect in an earlier shooting; the decedent was armed with a pistol but was holding the

gun over his head, pointed upward, while wrestling with another, smaller man;[8] and the

officer had fired his shotgun within three seconds after exiting his squad car, without

issuing any warnings or commands. *Craighead*, 399 F.3d at 960. On these facts, the

Eighth Circuit held that the decedent "did not pose a significant threat of death or serious

physical injury to [the officer] at the time [the officer] fired the shotgun because the pistol

was continuously over [the decedent's] head, pointed upward, as [decedent] was keeping it

from the smaller [man]." *Id.* at 962. The Eighth Circuit further held that these facts

"show[ed] that a warning was feasible but not given." *Id.* Because a reasonable officer

would have been on notice that the use of deadly force under these circumstances was

unconstitutional, the Eighth Circuit denied the officer's motion for summary judgment

based on qualified immunity. *Id.* at 962-63.

Other cases in the Eighth Circuit and elsewhere likewise established that the Fourth

Amendment prohibited an officer from using deadly force, particularly without warning,

against an individual who, although apparently armed, did not point a weapon at the officer

or make other threatening movements toward the officer. *See, e.g.*, *Wealot v. Brooks*, 865

F.3d 1119, 1123 n.3 (8th Cir. 2017) (denying qualified immunity based on clearly

established law as of 2013, to an officer who shot a fleeing suspect who had been armed

where there were questions of fact as to whether "the officers gave any warning to [the

suspect] and whether they saw [the suspect] drop the gun, as well as the [suspect's]

movements and the position of his hands in the moments before the officers shot him");

---

[8]      The smaller man was actually the suspect, and the decedent had taken the pistol
from the suspect.

*Nance*, 586 F.3d at 607, 610-11 (denying qualified immunity to an officer who shot an adolescent boy armed with a (toy) gun where there were fact issues as to whether the officer saw the gun in the boy's hand and whether the officers gave warnings before using deadly force); *Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (denying qualified immunity where, under the plaintiff's "version of the shooting, the police officers could not reasonably have believed the use of deadly force was lawful because [the victim] did not point the gun at the officers and apparently was not facing them when they shot him the first time"); *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (denying qualified immunity where there were fact issues as to whether the police-shooting victim ever turned and pointed his gun at the officer or took other actions that would have been objectively threatening); *but cf. Partlow v. Stadler*, 774 F.3d 497 (8th Cir. 2014) (granting an officer qualified immunity for shooting a man reported to be suicidal after the man exited his apartment building holding a shotgun and *undisputedly turned toward the officer* before the officer fired).

The cases cited above do not—and need not, for the purpose of qualified immunity—involve facts identical to the facts before the Court. *See Mullenix*, 136 S. Ct. at 308; *see also Rochell v. City of Springdale Police Dep't*, No. 17-3608, 2019 WL 1859237, at *1 (8th Cir. Apr. 25, 2019) (quoting *Thompson v. City of Monticello*, 894 F.3d 993, 999 (8th Cir. 2018) for the proposition that "[w]hile clearly established law should not be defined at a high level of generality it is not necessary, of course, that the very action in question has previously been held unlawful"). Although this is a close case, especially as B.C. was attempting to flee from the police, the cases cited are sufficiently particularized to

the facts here as to clearly establish that the Fourth Amendment prohibited Cohen's conduct in the situation he confronted, viewed in the light most favorable to Plaintiff: whether to shoot, within seconds after exiting his vehicle and without any warning, a teenager running away from the officer while holding a gun by the barrel, continuously pointed down.   Therefore, the Court will deny Cohen's motion for summary judgment based on qualified immunity.

## Municipal Liability Claim

The Court will grant Defendants' motion for summary judgment on Plaintiff's municipal liability claim under § 1983, which is based on the City's alleged "custom" of excessive force.   To establish a claim for "custom" liability, a § 1983 plaintiff must demonstrate (1) a widespread, persistent pattern of unconstitutional conduct, (2) deliberate indifference or tacit authorization of such conduct by the municipality's policymaking officials, and (3) a direct causal link between the custom and the injury alleged.   *Johnson v. Douglas Cty. Med. Dep't*, 725 F.3d 825, 828 (8th Cir. 2013).

The Court simply cannot find a pattern of unconstitutional excessive force based on Plaintiff's evidence of other police shootings and related investigations without delving into the details of each to determine whether the use of force was unreasonable and the investigation inadequate.   As discussed above, this inquiry is fact-intensive, and Plaintiff has not offered sufficient evidence of the facts.   *See Perkins v. Hastings*, 915 F.3d 512, 522-23 (8th Cir. 2019) (rejecting a similar attempt to prove "custom" liability with evidence of inadequate investigation into other police shootings, where there was insufficient evidence of the details of those shootings and the plaintiff's account of the

events was "largely speculative"). Nor has Plaintiff offered sufficient evidence of a direct causal link.

**Remaining State-Law Claims Against Cohen**

The Court will also grant Defendants' motion for summary judgment on Plaintiff's state-law claims. "Under Missouri law, the official immunity doctrine protects public officials from liability for injuries arising out of their discretionary acts or omissions, but not from liability in claims arising from their performance of ministerial acts." *Reasonover v. St. Louis Cty., Mo.*, 447 F.3d 569, 585 (8th Cir. 2006) (citation omitted). "[A] police officer's decision to use force in the performance of his duties is discretionary rather than ministerial." *Davis v. White*, 794 F.3d 1008, 1013 (8th Cir. 2015) (citing *Davis v. Lambert–St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo. banc 2006)).

But "official immunity does not apply to discretionary acts done in bad faith or with malice." *Id.* "Acting with malice requires an actual intent to cause injury." *Wealot v. Brooks*, 865 F.3d 1119, 1129 (8th Cir. 2017) (citing *State ex rel. Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. 1986)). "A finding of bad faith embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id.* (citations omitted).

The Court agrees with Defendants that there is insufficient evidence for a jury to conclude that Cohen acted with malice or in bad faith. Plaintiff relies on evidence that Cohen had decided prior to the date of the shooting that he was going to take A.C. and B.C. into custody based on Cohen's belief that they had been involved in the prior carjacking incident; that Cohen formulated a plan to apprehend A.C. in response to the 911 report

regarding the stolen gun; and that Cohen thereafter shot B.C. without warning while B.C. was fleeing, notwithstanding that B.C.'s clothes did not match the description of A.C.'s clothes. As discussed above, this and the other evidence of record may establish that Cohen's actions were unreasonable. But it cannot be rationally inferred from this evidence that Cohen acted with malice or bad faith. *See, e.g., Wealot*, 865 F.3d at 1129 (holding that, where there was evidence that officers shot a fleeing, non-threatening suspect with whom they earlier had a negative interaction, "even if a factfinder were to conclude the officers' beliefs that [the suspect] posed an immediate threat were mistaken or unreasonable, or that the officers behaved negligently or recklessly, under these circumstances, we agree there is insufficient evidence for a rational jury to conclude the officers acted with malice or in bad faith"). Cohen is thus entitled to official immunity.

**CONCLUSION**

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is **DENIED** as to Plaintiff's claim under 42 U.S.C. § 1983 against Defendant Michael Cohen in his individual capacity; the motion is otherwise **GRANTED**. ECF No. 107.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 10th day of May, 2019.